572 F.2d 121
 Floyd MORELAND, a minor by his next friend Maggie Moreland, Appellant,
v.
WESTERN PENNSYLVANIA INTERSCHOLASTIC ATHLETIC LEAGUE and
Pennsylvania Interscholastic Athletic Association
and School District of the Borough of Aliquippa.
 No. 77-1576.
 United States Court of Appeals,
Third Circuit.
 Argued Jan. 13, 1978.
Decided Feb. 27, 1978.
 
 John W. Dineen, Albert J. Jones, Timothy P. O'Brien, Neighborhood Legal Services Association, Aliquippa, Pa., for appellant.
 McNees, Wallace & Nurick, William M. Young, Jr., Rod J. Pera, Harrisburg, Pa., for Pennsylvania Interscholastic Athletic Association and Western Pennsylvania Interscholastic Athletic League.
 Before ALDISERT and HUNTER, Circuit Judges, and CAHN, District Judge.*
 OPINION OF THE COURT
 ALDISERT, Circuit Judge.
 
 
 1
 The question for decision is whether a high school basketball player was denied equal protection when his team was foreclosed from playing in post-season athletic league competition because it was placed under suspension for prior violations of league rules. Appellant Floyd Moreland, a high school junior at the commencement of this action, sought injunctive relief under 42 U.S.C. § 1983 against his local and state leagues, and his school district. After a hearing and upon motion by the defendants, the district court dismissed the complaint.
 
 I.
 
 2
 After conducting the hearing on appellant's preliminary injunction request, at which both parties presented evidence, the district court found that Moreland was a member of the Aliquippa, Pennsylvania, high school basketball team which won the 1976-1977 section championship of the Western Pennsylvania Interscholastic Athletic League (WPIAL). All Pennsylvania public high schools are eligible for membership in WPIAL's parent athletic league, the Pennsylvania Interscholastic Athletic Association (PIAA), whose stated purposes are to develop an "interscholastic athletic program which will promote, protect and conserve the health and physical welfare of all participants(;) to formulate and maintain policies that will safeguard the educational values of interscholastic athletics and cultivate high ideals of good sportsmanship (; and) to promote uniformity of standards in all interscholastic athletic competition." PIAA Constitution, 1976-77 PIAA Handbook, Article II (Defendant's Exhibit 2).
 
 
 3
 The "PIAA Philosophy" is stated as a preamble to its by-laws:
 
 
 4
 It is unconscionable that a school or any of its professional employees would subvert the high purposes of interscholastic athletics by condoning any violation of the rules which is inimical to the intent of the By-laws. To involve boys in any procedure or practice which "gets around the rules" is unworthy of a professional person associated with athletics.
 
 
 5
 1976-77 PIAA Handbook 7. PIAA by-laws relating to attendance provide that one who has been absent for 20 or more school days in a semester shall not be eligible to participate in any athletic contest until he has been in attendance for a total of 60 school days following his twentieth day of absence, Art. III, Sec. 2; that 15 days or more enrollment in a semester shall constitute one semester of enrollment, Art. III, Sec. 3; that a school may be suspended for using an ineligible player, Art. XII, Sec. 2B(2); and that a school may be publicly censured, Art. XII, Sec. 6, or placed on probation, Art. XII, Sec. 7, for violation of these rules.
 
 
 6
 Evidence presented at the hearing disclosed that in October 1976, the PIAA sanctioned Aliquippa High School pursuant to these by-laws for using players who were ineligible because of absenteeism on its football and basketball teams during the 1973 and 1975 seasons. The Aliquippa School Board passed a resolution accepting the punishment meted out by the PIAA: all games which were played during the years the violations occurred were forfeited to the opponents; the school board, the high school principal, and the football and basketball coaches who were in office during the 1973-75 seasons were officially censured; and Aliquippa's football and basketball teams were declared ineligible for any post-season competition, including sectional playoff, district and PIAA championship contests, for a period of two years, at least until the end of the 1977-78 school year. (Defendant's Exhibit 1).
 
 
 7
 The district court found that although under ordinary circumstances Moreland's team would have been eligible for post-season play, the two-year PIAA suspension prevented it from doing so in the 1976-1977 season.[1] It further found that no members of the 1976-1977 basketball team were involved in the violations; that Floyd Moreland "is an above average player to whom post season tournament play is an important factor in receiving publicity and recruiting attention frequently leading to college scholarships"; and that post-season tournament play attracts college scouts and coaches.
 
 
 8
 Pressing only an equal protection claim on appeal, appellant contends he was treated differently from other members of varsity basketball teams which participate in post-season tournaments in Pennsylvania. He also asserts unequal treatment because Aliquippa athletic teams other than football and bastketball are eligible for post-season WPIAL tournament play.
 
 II.
 
 9
 At the outset it is important to emphasize that appellant presents no due process claim on appeal. We are specifically informed that "(a)ppellant does not in any way claim a federally protected 'right' to play basketball or to participate in interscholastic athletics." Appellant's Brief at 7. Although appellant urges that the district court did not properly distinguish between those cases brought pursuant to due process claims and those brought pursuant to equal protection claims, our examination of the district judge's opinion persuades us that the trial court did make the necessary distinction. Perceiving Moreland's contentions as an admixture of claims of denial of due process and equal protection,[2] the district judge disposed of the due process contentions by concluding that the asserted claim did "not rise to the level of violations of specific constitutional guarantees . . . . Wood v. Strickland, 420 U.S. 308, 326, 95 S.Ct. 992, 43 L.Ed.2d 214 (1975)." Slip Opinion at 7, quoting Zeller v. Board of Education, 517 F.2d 600 (3d Cir. 1975).
 
 
 10
 The equal protection contention, the specific argument now urged upon us, was the subject of separate treatment. The court concluded, in this regard, that "the suspension was rationally related to (PIAA's) purpose in bringing about compliance with the PIAA regulations by a member of the Association (the school district)."[3] Slip Opinion at 5.
 
 A.
 
 11
 In addressing the equal protection claim, we must decide initially whether the PIAA rules for the regulation of interscholastic play operate to the disadvantage of a suspect class or impinge upon a fundamental right explicitly or implicitly protected by the Constitution, thereby requiring strict judicial scrutiny. If not, the rules must still be examined to determine if they pass the "rational basis test." Appellant concedes that it is not necessary to resort to strict judicial scrutiny and that the test is that articulated in San Antonio Independent School District v. Rodriguez,411 U.S. 1, 17, 93 S.Ct. 1278, 1288, 36 L.Ed.2d 16 (1973), whether the league schema may "rationally (further) some legitimate, articulated state purpose." We agree that this is the proper standard of review.[4] See also Dandridge v. Williams, 397 U.S. 471, 485, 90 S.Ct. 1153, 25 L.Ed.2d 491 (1970); F. S. Royster Guano Co. v. Virginia, 253 U.S. 412, 415, 40 S.Ct. 560, 64 L.Ed. 989 (1920). Moreover, the parties concede that the necessary state action is present to confer subject matter jurisdiction under 28 U.S.C. § 1343 in order to afford plaintiff a possible remedy under 42 U.S.C. § 1983.
 
 B.
 
 12
 We now examine the rules to determine if they are reasonably related to a legitimate state school interest. As previously observed, the stated purposes of the league's rules are to "safeguard the educational values of interscholastic athletics and cultivate high ideals of good sportsmanship" and "to promote uniformity of standards in all interscholastic athletic competition." Because over 1,200 Pennsylvania schools are voluntary members of WPIAL, it is readily apparent that interscholastic athletics are regarded as an important adjunct to the academic curriculum of the schools. PIAA District 7 Chairman Michael Arbutina testified to this effect at the hearing: "High school athletics should be considered as a part of the total school program and I think that the rules and regulations under which interscholastic athletics (are) governed is an attempt to keep it in its proper perspective in . . . the entire educational program." Transcript at 61.
 
 
 13
 A rule regulating attendance at class thus vindicates the league's legitimate interest in educational values. This is a league of school athletes, not an independent athletic union, nor a professional basketball association. Not only is it self-evident that a rule regulating class attendance reasonably relates to the educational values of the school league, but the rule's rational basis is also clearly demonstrated by the converse: without attendance rules, a school could recruit, for the duration of a season, athletes who possess few or no academic ties to the institution.
 
 
 14
 Similarly, the rule permitting suspension of a school for past violations of the eligible player rule rationally furthers the stated purposes. The stigma attached to a school, its principal, and its coaches, for violating the "rules of the game", serves as a meaningful deterrent to future violations. We note in this regard that the suspension imposed on Aliquippa was due partially to violations which had occurred in addition to the absenteeism violations during the 1973 and 1975 seasons. At the time Moreland entered Aliquippa High School, and at the time he entered the basketball program, the school had already been placed on probation for offenses other than using ineligible players. Transcript 39-40. Thus, Chairman Arbutina testified that "as a result of the continuing probation, the Committee felt that it had to become more severe in the penalties assessed against the school district in an effort to gain acceptance by the school district to abide by the rules and regulations." Id. at 42. Under the circumstances, there appears to be much merit to Arbutina's characterization of the PIAA's action in letting the individual students at least play regular season games as "compassionate."
 
 
 15
 Because high school teams generate widespread community interest, when a school is suspended for violation of the PIAA rules the responsible officials are exposed to the opprobrium of the greater school community. The sanction of suspending a successful team from post-season tournament competition visits powerful social and political pressures upon those officials. Thus, the rules serve a noteworthy societal and moral purpose. It is regrettable, however that enforcement of the rule sanctioned upon schools for serious breaches of the rules visits tangible deleterious effects upon certain innocent players, and in a larger sense, smears a blot on a proud school's escutcheon.
 
 
 16
 But the reality that the innocent do suffer because of the improper conduct of a guilty few is not an unusual occurrence in the sports world; it is an inherent risk in the rules of any game. In basketball itself, for example, if a player is guilty of a personal foul upon an opponent, the opposing team is entitled to possession of the ball or free throws, thus giving the opponents the opportunity of amassing extra points. In technical foul situations, also, innocent team members may suffer because of the infraction of a guilty teammate or coach.
 
 
 17
 Accordingly, just as the Fifth Circuit found a rational basis for the Louisiana High School Athletic Association eligibility rule in Mitchell v. LHSAA, 430 F.2d 1155 (5th Cir. 1970), so do we find the PIAA rules here free from constitutional defect.[5]
 
 III.
 
 18
 A matter of procedure requires our attention. Although the district court granted the motion to dismiss the complaint, it did so after receiving evidence in the form of testimony, exhibits, and stipulations. The Federal Rules of Civil Procedure permit a dismissal of a complaint, inter alia, upon a motion showing lack of jurisdiction over the subject matter, Rule 12(b)(1), or failure to state a claim upon which relief can be granted, Rule 12(b)(6), and if, under a Rule 12(b)(6) motion, "matters outside the pleading are presented to and not excluded by the court, the motion shall be treated as one for summary judgment and disposed of as provided in Rule 56 (summary judgment)". Although appellees urge that their motion is capable of being construed as a Rule 12(b) (1) motion, for lack of allegation of a substantial federal question,[6] the record in the district court persuades us that the court treated appellees' motion as a "speaking motion." The record discloses that the court relied upon material facts which were undisputed; that the court discussed the Equal Protection Clause in terms of the "rationally related" test; and that rather than assuming the lack of a substantial equal protection claim, the court considered the merits and found no equal protection violation to exist.
 
 
 19
 In sum, because the court considered matters outside the pleadings, the dismissal motion should have been converted into one for summary judgment. This being so, the proper disposition was an order of summary judgment in favor of the defendants, rather than dismissal of the complaint.
 
 
 20
 The order of the district court will be vacated and the proceedings remanded for the purpose of entering summary judgment in favor of the defendants. Each party to pay its own costs.
 
 
 
 *
 Honorable Edward N. Cahn, of the United States District Court for the Eastern District of Pennsylvania, sitting by designation
 
 
 [1]
 This matter could arguably be considered moot, since the 1976-1977 winning season of Aliquippa High School is over and the post-season tournaments have taken place. DeFunis v. Odegaard, 416 U.S. 312, 94 S.Ct. 1704, 40 L.Ed.2d 164 (1974); Craig v. Boren, 429 U.S. 190, 97 S.Ct. 451, 50 L.Ed.2d 397 (1976). However, should the team again win this year and qualify for post-season competition, there is the practical question whether Moreland could obtain judicial review in a fresh suit. Because we believe that the issue he poses is one "capable of repetition, yet evading review," see Southern Pacific Terminal Co. v. ICC, 219 U.S. 498, 515, 31 S.Ct. 279, 283, 55 L.Ed. 310 (1911); Roe v. Wade, 410 U.S. 113, 93 S.Ct. 705, 35 L.Ed.2d 147 (1973); Super Tire Engineering Co. v. McCorkle, 416 U.S. 115, 94 S.Ct. 1694, 40 L.Ed.2d 1 (1974), we determine that as to Moreland, the problem is not moot
 
 
 [2]
 During the district court's hearing, Moreland's counsel argued that "we are not asserting that the plaintiffs have a federally or constitutionally protected right to participate in school athletics. They have no property right." Transcript at 2. However, in his complaint, plaintiff specifically averred that his exclusion from post-season competition violated, inter alia, "the plaintiff's fundamental substantive due process right to be free from punishment. . . ." Plaintiff's Complaint, Paragraph 1, Causes of Action. Under the circumstances, the district court properly met this contention
 At least two Courts of Appeals the Tenth and the Fifth have determined that participation in school athletics is not a constitutionally protected property interest subject to due process safeguards. Albach v. Odle, 531 F.2d 983 (10th Cir. 1976); Parish v. NCAA, 506 F.2d 1028 (5th Cir. 1975). Cf. Howard University v. NCAA, 166 U.S.App.D.C. 260, 510 F.2d 213 (1975). In one of the most recent, and widely discussed, "right-to-play" cases, the Eighth Circuit found it unnecessary to resolve the issue. University of Minnesota v. NCAA, 560 F.2d 352 (8th Cir. 1977).
 
 
 [3]
 The sentence that follows in the court's opinion is subject to dual interpretations: "Nor is there a right violated which rises to the dignity of a protected constitutional right." If this is a transitional sentence to the due process discussion that follows in the opinion, it coincides precisely with the court's conclusion that there is no constitutional right to play basketball. Appellant does not quarrel with this approach. If the sentence is construed as a continuation of the court's equal protection discussion, it perforce must be considered obiter dictum, inasmuch as the court previously found no violation of rights assured by the Equal Protection Clause
 
 
 [4]
 At oral argument, appellant muddied the jurisprudential waters in asserting that the standard of judicial review is that stated in Reed v. Reed, 404 U.S. 71, 76, 92 S.Ct. 251, 254, 30 L.Ed.2d 225 (1971), to-wit, whether the classification "bears a rational relationship to a state objective that is sought to be advanced by the operation" of the rules. It is now generally accepted that the Reed formulation is used in gender classifications only. As stated in Craig v. Boren, 429 U.S. 190, 97 S.Ct. 457, 50 L.Ed.2d 397 (1976): "To withstand constitutional challenge, previous cases establish that classification by gender must serve important governmental objectives and must be substantially related to achievement of those objectives." Id. at 197, 97 S.Ct. at 457, citing Reed
 Concurring in Craig, Justice Powell observed:
 Reed and subsequent cases involving gender-based classifications make clear that the Court subjects such classifications to a more critical examination than is normally applied when "fundamental" constitutional rights and "suspect classes" are not present. *
 
 
 *
 As is evident from our opinions, the Court has had difficulty in agreeing upon a standard of equal protection analysis that can be applied consistently to the wide variety of legislative classifications. There are valid reasons for dissatisfaction with the "two-tier" approach that has been prominent in the Court's decisions in the past decade. Although viewed by many as a result-oriented substitute for more critical analysis, that approach with its narrowly limited "upper-tier" now has substantial precedential support. As has been true of Reed and its progeny, our decision today will be viewed by some as a "middle-tier" approach. While I would not endorse that characterization and would not welcome a further subdividing of equal protection analysis, candor compels the recognition that the relatively deferential "rational basis" standard of review normally applied takes on a sharper focus when we address a gender-based classification. So much is clear from our recent cases
 429 U.S. at 210, 97 S.Ct. at 464 (Powell, J., concurring).
 Justice Stevens voiced a similar reluctance to characterize the present state of equal protection analyses in strictly logical form:
 
 
 I
 am inclined to believe that what has become known as the two-tiered analysis of equal protection claims does not describe a completely logical method of deciding cases, but rather is a method the Court has employed to explain decisions that actually apply a single standard in a reasonably consistent fashion. I also suspect that a careful explanation of the reasons motivating particular decisions may contribute more to an identification of that standard than an attempt to articulate it in all-encompassing terms
 429 U.S. at 212, 97 S.Ct. at 464 (Stevens, J., concurring).
 Professor Kenneth L. Karst recently commented on the Court's adoption of various standards:
 "Rational basis" in its most permissive form still governs cases of business regulation. E. g., City of New Orleans v. Dukes, 427 U.S. 297 (97 S.Ct. 2513, 49 L.Ed.2d 511) (1976). The rational basis test takes on real "bite" in the illegitimacy cases. . . . For cases of gender discrimination, we have the formulation of Craig v. Boren, 429 U.S. 190 (97 S.Ct. 451, 50 L.Ed.2d 397) (1976); . . . which may or may not differ in effect from the standard of the illegitimacy cases. Alienage as a classification is "suspect," but does not produce the same results as race. . . . And racial classifications, at least when they run against disadvantaged racial minorities, continue to demand the strictest scrutiny in the Court's arsenal of standards. If this is not a sliding scale of standards of review, what is it?
 Karst, The Supreme Court 1976 Term, Foreword: Equal Citizenship Under The Fourteenth Amendment, 91 Harv.L.Rev. 1, 42 n. 226 (1977).
 
 
 [5]
 Appellees would have us read Mitchell as foreclosing the assertion of an equal protection claim in right-to-play cases. We do not share appellees' certainty. Although the court stated that "neither of appellee's allegations (due process and equal protection) raises a substantial federal question," 430 F.2d at 1157, it nevertheless proceeded to discuss the equal protection contention on the merits, discussing first the appropriate standard of judicial review and then demonstrating why the rule was "grounded in, and reasonably related to, a legitimate state interest." 430 F.2d at 1158-59
 
 
 [6]
 In view of the procedural posture of this case, we assume, without deciding, that a substantial federal question is involved
 We note that in Baker v. Carr, 369 U.S. 186, 82 S.Ct. 691, 7 L.Ed.2d 663 (1962), the Supreme Court stated:
 Dismissal of the complaint upon the ground of lack of jurisdiction of the subject matter would . . . be justified only if that claim were "so attenuated and unsubstantial as to be absolutely devoid of merit," Newburyport Water Co. v. Newburyport, 193 U.S. 561, 579, (24 S.Ct. 553, 557, 48 L.Ed. 795) or "frivolous," Bell v. Hood, 327 U.S. 678, 683, (66 S.Ct. 773, 776, 90 L.Ed. 939). That the claim is unsubstantial must be "very plain." Hart v. Keith Vaudeville Exchange, 262 U.S. 271, 274, (43 S.Ct. 540, 541, 67 L.Ed. 977).
 369 U.S. at 199, 82 S.Ct. at 700 (footnote omitted).